**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 11-00095-DD |
| Steven Rhett Sandifer and Cynthia M. Sandifer, | Chapter 12 |
| Debtors. | **ORDER DENYING MOTION TO DISMISS** |

This matter is before the Court on a Motion to Dismiss Case ("Motion") filed by AgSouth Farm Credit, ACA ("AgSouth") on March 8, 2011. An Objection to the Motion was filed on March 29, 2011 by Steven Rhett Sandifer and Cynthia M. Sandifer ("Debtors"). AgSouth filed a supplemental memorandum in support of its Motion on March 23, 2011. A hearing was held on March 30, 2011. AgSouth's Motion is denied.

**FINDINGS OF FACT**

Debtors filed for chapter 12 protection on January 6, 2011. Mr. Sandifer and his son Steven Jeffrey Sandifer ("the Sandifers"), who also filed a chapter 12 bankruptcy case on the same day, conduct a farming operation. Steven Jeffrey Sandifer testified at the March 30 hearing that he and Mr. Sandifer have been farming together full-time since 2002. The farming operation consists of several hundred acres of farmland, part of which is leased and part of which is owned by one or both of the Sandifers. The Sandifers plant numerous crops, including soybeans, corn, peanuts, and watermelon. They also have a poultry house and a breeder poultry operation under a contract with Amick Farms.

In January 2008, the Sandifers formed a limited liability company for their farming operation in the name of Sandifer & Son Farms, LLC ("LLC"). Prior to the formation of this entity, the Sandifers did business under their individual names or under the name Sandifer & Son

Farms. Beginning in about 2007, the Sandifers took out multiple loans with multiple creditors, including AgSouth, to finance their farming operation. All of these loans are in the individual name of either Debtors, Steven Jeffrey Sandifer, or Sandifer & Son Farms.[1] Debtors' Schedule D shows secured debt in the total amount of $1,073,682.10.[2] Debtors' Schedule F shows unsecured debt in the total amount of $371,438.23. This amount includes $133,723.33 owed to AgSouth.

Following the formation of the LLC, farm income was reported by the LLC, but was held in a bank account in the Sandifers' names. In 2008, the LLC had gross income of $588,045 and deductions of $727,136. In 2009, gross income totaled $481,380 and deductions totaled $555,548. The LLC made $193,683.57 of debt payments on behalf of the Sandifers in 2008 and $94,904.57 of debt payments on the Sandifers' behalf in 2009.

In addition to his work as a farmer, Mr. Sandifer was previously employed with SCANA and earns retirement in the amount of $34,749.96.[3] Mrs. Sandifer is employed as a teacher in Barnwell, South Carolina and earned $44,299.64 in 2008 and $47,947.04 in 2009. With other minimal amounts of income, Debtors' total non-farm income was $83,296.60 for 2008 and $85,511.00 for 2009. Debtors' Objection to AgSouth's Motion states that in 2010, farm income equaled $486,900. For 2011, the Sandifers project farm income of $564,019 and operating expenses of $274,125.

## CONCLUSIONS OF LAW

In its Motion, AgSouth argues that Debtors do not meet the eligibility requirements for chapter 12 relief for two reasons. First, AgSouth argues that Debtors do not receive more than

---

[1] Steven Jeffrey Sandifer's wife is also listed on at least one of the loans.
[2] This amount includes the lien of Ford Credit on a 2007 Mercury Mountaineer in the amount of $24,072.37. Additionally, South Carolina Bank & Trust, one of Debtors' mortgage creditors, has a lien on several tracts of land, including a 5 acre tract on which Debtors' residence sits.
[3] This is the amount that Debtors' Statement of Financial Affairs lists for 2008 and 2009.

50 percent of their income from farming and therefore do not meet the chapter 12 income requirement. AgSouth's second argument is that because Debtors have operated at a loss for the last three years, Debtors do not have "regular annual income," which is required for a chapter 12 debtor.

### I. 50 Percent Income Requirement

11 U.S.C. § 109(f) provides, "Only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title." "Family farmer" is defined in section 101(18). That section states:

> The term "family farmer" means –
>
> (A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $3,792,650 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for –
> (i)  the taxable year preceding; or
> (ii) each of the 2d and 3d taxable years preceding;
> the taxable year in which the case concerning such individual or such individual and spouse was filed.

There is no dispute that Debtors meet the debt requirements set forth in section 101(18) or that Debtors are "engaged in a farming operation"; as a result, the only issue is whether more than 50 percent of Debtors' gross income was "receive[d] from [a] farming operation."

Gross income is not defined in the Bankruptcy Code. Generally, when interpreting statutes, courts should adhere to the plain meaning of the statute, except in the unusual situation that "'"the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."'" *In re Lamb*, 209 B.R. 759, 760 (Bankr. M.D. Ga. 1997) (quoting

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 1031 (1989)). *See also Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001) (discussing two "extremely narrow exceptions to the Plain Meaning Rule," the first of which is "when literal application of the statutory language at issue produces an outcome that is demonstrably at odds with clearly expressed congressional intent to the contrary," and the second of which applies "when literal application of the statutory language at issue 'results in an outcome that can truly be characterized as absurd, *i.e.*, that is so gross as to shock the general moral or common sense. . . .'") (alteration original); *Matter of Schafroth*, 81 B.R. 509, 511 (Bankr. S.D. Iowa 1987) ("[T]his court cautioned that 'a strict tax code approach should be modified or abandoned in those cases in which a tax code solution would be absurdly irreconcilable with the Chapter 12 statutory provisions and legislative history.'") (quoting *Matter of Faber*, 78 B.R. 934, 935 (Bankr. S.D. Iowa 1987)). Many courts considering the issue have concluded that "gross income" for purposes of the Bankruptcy Code should be defined using the Internal Revenue Code definition of "gross income." One such court stated,

> [T]his Court concludes that Congress intended the term "gross income" to have its ordinary Tax Code meaning. Since Congress drafted the Tax Code as well, it is logical to conclude that they fully understood the implications of using these terms of art. Furthermore, the language speaks of "gross income for the *taxable year* preceding the *taxable year* in which the case . . . was filed." Such diction makes inescapable the conclusion that Congress intended on importing the Tax Code definition to the Bankruptcy Code.

*Lamb*, 209 B.R. at 760–61 (alterations original).

26 U.S.C. § 61 defines "gross income" as "all income from whatever source derived." Thus, if Debtors receive income from the LLC, it appears that such income would be included in the computation of Debtors' total gross income. Testimony at the hearing established that upon forming the LLC, the Sandifers elected to treat it as an Subchapter S corporation for tax

purposes; as a result, "the corporation's profits pass through directly to its shareholders on a *pro rata* basis and are reported on each shareholder's individual federal income tax returns." *Hillman*, 263 F.3d at 339, n.1. *See also Schafroth*, 81 B.R. at 511–12 ("Income from a closely held corporation that qualifies as a subchapter S corporation passes through the corporation to the shareholders. Subchapter S income must be taken into account in determining the shareholders' tax liability."). AgSouth argues that Debtors did not include the LLC's income on their 2008 and 2009 tax returns, and as a result, the LLC's income cannot be included for purposes of the chapter 12 eligibility requirement. More specifically, AgSouth's complaint is that Debtors did not report any farm income on line 18 of their income tax return in either 2008 or 2009.

At least one bankruptcy court has stated that in the event debtors farm through a subchapter S corporation, the corporation's income would be included in the calculation of the debtors' gross income. In *Schafroth*, the debtors were the officers, directors, and shareholders of a farm corporation and operated the corporation, "manag[ing] and provid[ing] labor for the corporation." *Schafroth*, 81 B.R. at 509–10. The individual debtors filed chapter 12 petitions, as did the corporation. *Id.* A creditor objected, claiming that the debtors did not meet the 50 percent income requirement. *Id.* at 510. The debtors responded that the corporation's income should be attributed to them. *Id.* at 510–11. The court stated:

> There is no evidence in this case clearly setting forth the corporate nature of Bluridg Farms, Inc. The corporation's income would be attributable to the debtors if Bluridg were a subchapter S corporation. No tax documents have been presented which show the gross income of a subchapter S corporation or the debtors' proportional share of items attributed to the shareholders. Therefore the court cannot determine whether Bluridg is a subchapter S corporation or a regular corporation (known in tax parlence as a subchapter C corporation). Assuming Bluridg was a subchapter C corporation, its income would not be attributable to the debtors unless a distribution were made. No evidence has been presented which shows such a distribution.

*Schafroth*, 81 B.R. at 512.

The Court notes that some courts considering pass-through income have stated that the corporation's *profits* pass through to the shareholders, while other courts have held that the corporation's *income* passes through. *Compare Hillman*, 263 F.3d at 339, n.1 *with Schafroth,* 81 B.R. at 512. AgSouth's position is that the income belongs to the LLC and only passes through by virtue of the Sandifers' interest as members. Therefore, AgSouth argues, the Sandifers can only receive a distribution of any profit the LLC earns. The better rule, for purposes of analyzing the section 101(18) 50 percent income requirement, is that the LLC's gross income should pass through to its members and be considered income of those members. This is consistent with the purpose of chapter 12 and accounts for the totality of the financial circumstances of Debtors.

The purpose of chapter 12 is to provide farmers with the chance to save their farms, restructure their debt, and continue farming. *See In re Hettinger*, 95 B.R. 110, 112 (Bankr. E.D. Mo. 1989) (holding that what constitutes a farming operation must be decided based on the totality of the circumstances and stating, "It is clear that the one common thread in all farming legislation is the desire to save the family farmer."). This Court approaches chapter 12 eligibility issues with a view towards being flexible and considering the totality of the debtor's circumstances in order to ensure that eligibility determinations fulfill rather than defeat the stated purpose of chapter 12. *See In re Watford*, 898 F.2d 1525, 1528 (11th Cir. 1990) ("Congress' intent in passing Chapter 12 of the Bankruptcy Code was to allow farmers to keep their land despite their financial troubles."); *Hettinger,* 95 B.R. at 112 ("It is clear that the one common thread in all farming legislation is the desire to save the family farmer. The definitions of 'family farmer' and 'farming operation' are to prevent those individuals who are obviously non-

farmers from receiving the benefits of farming legislation. . . . [The debtor] should receive those benefits if he can demonstrate that he has an active farming history; and his conduct reveals an intent to salvage his farm for future use. . . . [I]f the debtor can provide clear and convincing evidence that his conduct is based on sound business judgment that in order to save the farming business, it is necessary in the present and immediate future to take such drastic steps, then he has met his burden of proving that he, in fact, is a 'family farmer' conducting a 'farming operation'."); *In re Rott*, 73 B.R. 366, 373 (Bankr. D.N.D. 1987), *abrogated on other grounds*, *Wagner v. Armstrong (In re Armstrong)*, 36 F.3d 723 (8th Cir. 1994) ("The court does not believe that farmers forced to *partially* liquidate assets or *temporarily* rent out machinery or farmland, in an effort to salvage their farm operation, should be foreclosed from seeking relief under Chapter 12, if such actions cause the 50% farm income test not to be met. Clearly, Congress did not intend that farmers who make sound business decisions pre-bankruptcy in an effort to remedy their financial woes should be excluded from Chapter 12 relief when their immediate intention is to reorganize by actually farming.").

    Debtors are clearly the type of individuals that chapter 12 is designed to protect. Debtors have been engaged in farming for many years, are currently engaged in farming, and will continue to farm in the future. Much of the existing farm debt is in Debtors' names. Steven Jeffrey Sandifer testified that all of the income from the LLC was deposited into a bank account in the Sandifers' individual names. Operating expenses were paid out of that bank account. A large portion of the income was also used to make payments on the Sandifers' farm debt obligations. Clearly, after the LLC was formed the Sandifers continued to run their farming operation in exactly the same fashion as before. The Court finds that the farm income reported by the LLC is attributable to Debtors. As a result, Debtors earn at least half of their income from

the farming operation and meet the definition of "family farmer" in section 101(18). To hold otherwise would merely create an impediment to adopting the limited liability company form of doing business and would deprive farmers of important tax benefits and a mechanism to reduce personal liability.

## II. Regular Annual Income

In addition to meeting the definition of "family farmer", in order to qualify under chapter 12, a debtor must have "regular annual income." Section 101(19) provides, "The term 'family farmer with regular annual income' means family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title." AgSouth complains that Debtors do not meet this definition because Debtors' Schedule J shows a monthly deficit and because Debtors have reported farm income losses for at least the past two years.

The definition of "family farmer with regular annual income . . . is extremely broad and was designed to allow nearly every person who qualifies as 'family farmer' to be eligible for chapter 12 relief." 2 Collier on Bankruptcy ¶ 101.19 (16th ed.). Because this eligibility requirement overlaps with the confirmation requirements, especially feasibility, the Court is best served by considering "the regularity of the debtor's income [as] a matter usually best left to the plan confirmation process." *Id. See also In re Welch*, 74 B.R. 401, 405 (Bankr. S.D. Ohio 1987) ("Whether [the debtors] have the annual income to fund their plan will be determined at the confirmation hearing."). However, because AgSouth has requested dismissal of Debtors' case on this basis, the Court must also consider this eligibility requirement at this early stage in the case.

The Court finds that Debtors have regular annual income sufficient to make chapter 12 plan payments. Debtors have non-farm income of at least $83,000, which they will continue to earn going forward. In 2008, the LLC had gross income of $588,045 and in 2009, gross income totaled $481,380. The Sandifers project that the LLC will earn $564,019 of gross income in 2011. Although the LLC has operated at a loss for the last few years, due in large part to attempts to meet substantial debt service obligations, it appears that its financial condition will improve going forward for a number of reasons.

Steven Jeffrey Sandifer testified at the hearing on AgSouth's Motion that the Sandifers had made some poor farming choices regarding land usage and types of crops in past years and that they had made adjustments this year which would likely increase their profitability.[4] Testimony further established that the Sandifers' poultry operation will remain profitable, as it has been in the past. Due to the Sandifers' strong relationship with Amick Farms and their position as a regular top producer for Amick, it is highly likely that the Sandifers' poultry operation will continue. This relationship will also provide the Sandifers the benefit of a priority for the sale of their corn; because the Sandifers have a contract with Amick Farms, the Sandifers will receive priority when Amick Farms purchases corn as feed for its poultry operation. Projections prepared by Steven Jeffrey Sandifer indicate that at the end of 2011 there will be a cash surplus of at least $154,444 from the Sandifers' farming operation. This money will be available for debt servicing. Based on these considerations, the Court finds that Debtors have sufficiently regular and stable income to make payments under a chapter 12 plan.

---

[4] For example, Steven Jeffrey Sandifer testified that the Sandifers will reduce the amount of watermelons they plant in 2011 to only five acres, as watermelons are less profitable than other crops, and will begin growing cotton in larger amounts, as cotton was very profitable for the Sandifers in the past. Steven Jeffrey Sandifer also testified that the Sandifers have gotten rid of land less suitable for farming and are now focusing on their best farming land.

## **CONCLUSION**

Debtors are eligible for chapter 12 relief. Debtors are "family farmers" and have regular annual income sufficient to make plan payments. Debtors' case may proceed under chapter 12 of the Bankruptcy Code.

AND IT IS SO ORDERED.

**FILED BY THE COURT
04/13/2011**



Entered: 04/14/2011

*David R. Duncan*
US Bankruptcy Judge
District of South Carolina